IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CELEBRATE VIRGINIA SOUTH
HOLDING COMPANY, LLC, *et al.*,
     Plaintiffs,

     v.                            Civil No. 3:21cv261 (DJN)

CVAS PROPERTY
MANAGEMENT, LLC, *et al.*,
     Defendants.

## MEMORANDUM OPINION

Plaintiffs Celebrate Virginia South Holding Company, LLC ("CVS Holdings") and UMB CV Holding Company, LLC ("UMB," collectively, "Plaintiffs") bring this action against Defendants Celebrate Virginia South Property Management, LLC ("CVS Management"), Celebrate Virginia South, L.L.C. ("CVS"), CVAS 2, LLC ("CVAS 2"), CVAS Boulevard, LLC ("Boulevard"), CVAS Parkway, LLC ("Parkway"), SCH at Celebrate Virginia South, LLC ("SCH"), The Collection at Celebrate Virginia South, LLC ("Collection"), CVAS Properties, LLC ("Properties"), CVAS Grocery, LLC ("Grocery"), Rappahannock Quarry West, L.L.C., ("Quarry"), CVA Expo Center, LLC ("Expo") and Celebrate Virginia South Owners Association, Inc. (the "Association"), alleging interference with property rights related to land within the unified development Celebrate Virginia South, seeking legal and equitable relief. This matter now comes before the Court on the Motion to Dismiss (ECF No. 12) filed by Defendants.

For the reasons set forth below, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion (ECF No. 12). Specifically, the Court DENIES Defendant's Motion

as to Counts One and Two of the Complaint (ECF No. 1).  However, the Court GRANTS Defendant's Motion as to Counts Three, Four and Five.

## I.    BACKGROUND

At this stage, the Court must accept as true the facts set forth in the Complaint (ECF No. 1).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving Defendants' Motion.

### A.    Factual Background

This case involves a commercial, retail and residential common plan development known as Celebrate Virginia South (the "Project"), located in the City of Fredericksburg, Virginia. (Compl. ¶¶ 20, 24; Declaration for Celebrate Virginia South R-4 (ECF No. 1-1).)  The Project includes multiple land parcels that CVS, CVAS 2, Boulevard and Parkway (collectively, the "Foreclosure Defendants") previously owned.  (Compl. ¶ 21.)  Silver Development, its affiliates and their underlying principal, Larry D. Silver (collectively, "Silver"), own or control each of the Foreclosure Defendants.  (Compl. ¶ 21.)

In December 2000, the City of Fredericksburg created the Celebrate Virginia South Community Development Authority and a special assessment district.  (Compl. ¶ 22.)  In 2006, the Community Development Authority issued bonds (the "Series 2006 Bonds") to raise proceeds to fund development of public infrastructure benefitting lands owned by the Foreclosure Defendants.  (Compl. ¶ 23.)  To secure repayment of the bonds, the District imposed a special assessment lien against property within the District.  (Compl. ¶ 23.)

CVS and the founding entities subjected the Project to various provisions and restrictions that run with the land as set forth in several recorded documents, including two land declarations relevant to this case: (1) a property owners association declaration, the Declaration for Celebrate

2

Virginia South (as amended and supplemented, the "POA Declaration" (ECF No. 1-1)), dated

December 16, 2005, and recorded in the land records of the City of Fredericksburg (the "Land

Records") (Compl. ¶¶ 24–27, 118–20); and (2) the Declaration of Covenants, Restrictions and

Agreements for Celebrate Virginia South, Fredericksburg, Virginia, (the "Gondola Declaration"

(ECF No. 13-1)) dated December 12, 2005, and recorded in the Land Records. (Compl. ¶ 76;

Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Compl. ("Pls.' Resp.") (ECF No. 17)

at 9.) The POA Declaration underlies Counts One and Two, while the Gondola Declaration

underlies Counts Three, Four and Five.

   **1.**  **The 2018 Assignment of Declarant Rights**

   In December 2005, CVS recorded the POA Declaration. (Compl. ¶¶ 24–28.) At that

time, CVS owned nearly all of the land within the Project and the POA Declaration designated

CVS as the original Declarant. (Compl. ¶ 28.) Defendant Quarry, a property owner controlled

by CVS, joined, along with several others, in execution of the POA Declaration to subject their

property to the terms and conditions contained therein. (Compl. ¶¶ 29–30.) The POA

Declaration, the Articles of Incorporation (the "AOI" (ECF No. 1-2)), any Supplementary

Declarations and the Bylaws, as amended from time to time, constitute the "Association

Documents." (POA Decl. § 1.1(7).) "The Association Documents shall be construed together

and shall be deemed to incorporate one another in full." (POA Decl. § 1.2(d).) The POA

Declaration defines "Declarant" as "Celebrate Virginia South, LLC, . . . or its assigns pursuant to

Article 5 of the [POA] Declaration or pursuant to any instrument properly recorded in the Land

Records and executed by the Declarant." (POA Decl. § 1.1(19).)

   As Declarant, CVS, and any successors or assigns, possessed "Declarant Rights" for the

duration of the "Declarant Control Period" (the "DCP"). (Compl. ¶ 31.) The Declarant Rights

3

include, *inter alia*, the right to:  use and grant certain easements; approve design, development and building plans; bid upon property foreclosed upon by the Celebrate Virginia South Owners Association, Inc. (the "Association"); record certain amendments to the POA Declaration; veto any proposed termination of the Declaration; submit additional land to the terms of the POA Declaration.  (Compl. ¶ 31; POA Decl. §§ 3.1, 8.5, 12.2(c), 14.1, 14.5, 15.2, 18.1.)  The Declarant Rights also include the right to vote as Class B Member of the Association, casting three votes per acre owned, over the Class A Members', including Plaintiffs', one vote per acre. (Compl. ¶ 31; AOI § 4.2.)  The DCP ends on the earliest of three dates:  December 16, 2025; the day the number of Class A votes equals twice the number of Class B votes; or the date chosen by the Declarant.  (Compl. ¶ 56; POA Decl. § 1.1(20).)

The POA Declaration allows the Declarant to transfer Declarant Rights pursuant to provisions within Article 5.  (POA Decl. § 5.2(a)–(e).)  The Declarant has exercised its right to transfer Declarant Rights on several occasions, including in 2007, 2011 and 2018.  (Compl. ¶¶ 35–37, 51.)  In 2007, CVS conveyed land within the Project to CVAS 2 and contemporaneously partially assigned certain Declarant Rights related to that land.  (Compl. ¶¶ 35–36.)  In 2011, CVS and CVAS 2 conveyed land within the Project to Boulevard and Parkway and partially assigned certain Declarant Rights related to that land.  (Compl. ¶¶ 37–38.) In 2018, the Foreclosure Defendants assigned their Declarant Rights, which forms the basis of Counts One and Two, as discussed in further detail below.  (Compl. ¶¶ 51–52.)

Beginning in 2009 and continuing thereafter, the Foreclosure Defendants defaulted on the payment of taxes and assessments pledged to repay the Series 2006 Bonds.  (Compl. ¶ 40).  After years of attempting to enforce collection, the City sold the Foreclosure Defendants' property on

May 31, 2018 at a tax sale.  (Compl. ¶¶ 41–46.)  At the tax sale, Plaintiff CVS Holdings acquired

three parcels.  (Compl. ¶ 47.)  Plaintiff UMB later acquired fee title to a fourth parcel.  (Compl.

¶ 47.)  UMB Bank controls both CVS Holdings and UMB in its capacity as trustee for the Series

2006 Bonds and trust assets for the benefit of the bondholders.  (Compl. ¶ 48.)  The POA

Declaration and its rights and restrictions apply to Plaintiffs' parcels as a part of the trust estate.

(Compl. ¶ 49.)

Three weeks before the tax sale, the Foreclosure Defendants assigned their Declarant

Rights (the "2018 Assignment") to related entities CVAS P10, LLC (which changed its name to

SCH), Collection, Quarry, Properties, Expo and Grocery (collectively, the "Successor

Declarants") and recorded that instrument on May 10, 2018.  (Compl. ¶¶ 51–52.)  Each of the

Successor Declarants also constitute Silver controlled entities.  (Compl. ¶ 52.)  Additionally,

each owned property within the Project before the 2018 Assignment, most for multiple years.

(Compl. ¶¶ 51, 64.)

In August 2020, Plaintiffs sent the Successor Declarants a letter requesting that they turn

over control of the Association to the Class A Members, asserting that the 2018 Transfer proved

invalid and, resultantly, the Declarant Control Period lapsed upon the completion of the tax sale.

(Compl. ¶¶ 70–71.)  The Successor Declarants wrote back denying Plaintiffs' request and

objecting to their allegations.  (Compl. ¶ 73.)

### 2.    The Gondola Easement

In December 2005, just before executing the POA Declaration, CVS also executed the

Gondola Declaration.  The Gondola Declaration provides that it binds all then-present and future

owners of property in the Project.  (Gondola Decl. ¶ 14.)  Accordingly, the Gondola Declaration

applies to Plaintiffs' parcels.  (Gondola Decl. ¶ 14; Supplemental Declaration of Covenants

Restrictions and Agreements for Celebrate Virginia South, Fredericksburg, Virginia (the "2013 Supplemental Declaration") (ECF No. 1-19) ¶¶ 4–6.)

At the time, CVS owned all property in the Project and thus named itself as the original Declarant (the "Gondola Declarant"). (Compl. ¶ 76; Gondola Decl. at 1.) Like the POA Declaration, the Gondola Declaration defines "[Gondola] Declarant" to include the successors and assigns of the Gondola Declarant. (Gondola Decl. ¶ 11.) In 2013, CVS assigned its rights as Gondola Declarant to CVS Management, an entity created by Silver to manage development of the Project. (Compl. ¶¶ 74, 79, 80.) CVS Management, the current Gondola Declarant, does not own property in the Project. (Compl. ¶¶ 79, 92, 96, 103.)

The Gondola Declaration gives the Gondola Declarant control and regulation of several development covenants, requirements regarding use of property within the Project, architectural standards and approval for building and improvement plans. (Gondola Decl. ¶¶ 2–9.) Paragraph Nine of the Gondola Declaration establishes the Gondola Declarant's right to construct a gondola facility (the "Gondola Facility") within the Project, identifies the facilities within the Project (i.e., parking areas, shops, a terminal, etc.) and declares that "[t]he location, design and operation of the Gondola Facility are all in [the Gondola] Declarant's sole discretion, and any person acquiring property within the Development hereby consents to all of the same and the operation of such facility in any manner selected by the [Gondola] Declarant." (Compl. ¶ 76; Gondola Decl. at 4).

The Declarant originally intended the Gondola Facility to provide "aerial transportation from the Development across the Rappahannock River to a station within the Celebrate Virginia North Development and back again." (Compl. ¶ 76; Gondola Decl. ¶ 9.) A Limited Offering Memorandum (the "LOM" (ECF No. 17-2)) distributed in connection with the issuance of the

6

Series 2006 Bonds stated the proposed gondola's purpose in similar terms.  (Compl. ¶ 76.)  In the fifteen years since CVS recorded the Gondola Declaration, the Gondola Declarant has not constructed a Gondola Facility or any components thereof.  (Compl. ¶ 78.)

In 2013, the possibility of foreclosure on some parcels in the Project put the Gondola Declarant at risk of losing the ability to develop or manage the development of the Project. (Compl. ¶ 79.)  Pursuant to its sole discretion as granted by the Gondola Declaration, the Gondola Declarant determined the location of the Gondola Facility in 2013.  (Compl. ¶¶ 76, 84; 2013 Suppl. Decl. at 1.)  Accordingly, the Gondola Declarant, along with the then-owners of property in the Project, executed and recorded the 2013 Supplemental Declaration.  (Compl. ¶¶ 81–85; 2013 Suppl. Decl. at 1.)  Among other things, the 2013 Supplemental Declaration established the location for the Gondola Facility referenced in Paragraph Nine of the Gondola Declaration, established a "Gondola Easement Area," and granted an exclusive easement for the benefit of the Gondola Declarant (the "Gondola Easement").  (2013 Suppl. Decl. at 2.) Paragraph Two of the 2013 Supplemental Declaration establishes the Gondola Easement's purposes without connection or relation to transportation across the Rappahannock River. (Compl. ¶ 89; 2013 Suppl. Decl. ¶ 2.)  Among other provisions, Paragraph Three of the 2013 Supplemental Declaration states that:

> [The Gondola] Declarant expressly reserves the right to reconfigure, relocate, modify and/or release any portion, or the entirety, of the Gondola Easement at any time hereafter. No consent or approval of any Owner or any other party shall be necessary in connection with any reconfigure, relocation, modification or release provided, however, [the Gondola] Declarant shall give written notice of such relocation to any Owner whose land is affected.

The Gondola Easement encumbers three of Plaintiffs' parcels and has thus far remained unused.  (Compl. ¶ 92, 100.)  In June 2019, the Gondola Declarant released a portion of the Gondola Easement from certain areas "along the path of the Gondola Easement" (the "2019

Partial Easement Release" (ECF No. 1-20)) and allowed construction and development on the released land without accommodating for the easement.  (Compl. ¶ 102.)  On December 15, 2020, the Gondola Declarant sent a letter (the "December 15 Letter") to Charles Johnston, Director of the City's Department of Community Planning and Building, notifying the City of the Gondola Easement and that the proposed development on the UMB Parcel interfered with the Gondola Easement. (Compl. ¶ 107.)

### B.    Plaintiff's Complaint

On April 20, 2021, Plaintiffs filed their Complaint against Defendants, raising five counts for relief based on the above allegations.  Counts One and Two attack the 2018 Assignment of Declarant Rights before the tax sale.  In Count One, Plaintiffs allege, and seek declaratory judgment stating, that the 2018 Assignment proves void, because it violates the provisions of the POA Declaration, thus, terminating the DCP.  (Compl. ¶¶ 111–16.)  In Count Two, Plaintiffs allege that Defendants have breached the POA Declaration, seeking specific performance of the POA Declaration by requiring Defendants to relinquish control and turn over the Association to the Class A Members.  (Compl. ¶¶ 117–27.)

Counts Three through Five attack the Gondola Easement.  In Count Three, Plaintiffs allege, and seek declaratory judgment stating, that the Supplemental Declaration and Gondola Easement stand invalid and unenforceable, petitioning the Court to quiet title of the parcels encumbered by the Gondola Easement.  (Compl. ¶¶ 128–31.)  In Count Four, Plaintiffs allege, and seek declaratory judgment stating, that the Gondola Declarant terminated the Gondola Easement via abandonment, thereby waving its right to enforce the easement against Plaintiffs. (Compl. ¶¶ 128–35.)  In Count Five, Plaintiffs allege a slander of title claim arising from CVAS Property Management's representation of its rights to the Gondola Easement in the December 15

8

Letter. (Compl. ¶¶ 136–38.) Based on this claim, Plaintiffs seek an award of damages and an order enjoining CVAS Property Management from attempting to enforce the 2013 Supplemental Declaration and Gondola Easement. (Compl. at 35.)

     **C.**    **Defendants' Motion**

     In response to Plaintiffs' Complaint, on June 9, 2021, Defendants filed a Motion to Dismiss (ECF No. 12), moving to dismiss Plaintiffs' claims against them for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In support of their Motion, Defendants argue that all five of Plaintiffs' claims fail as a matter of law, because Plaintiffs had record notice of all of the encumbrances and restrictions affecting their property before acquisition, thereby binding the Plaintiffs. (Defs.' Mem. in Supp. of Mot. to Dismiss the Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) ("Defs.' Mem.") (ECF No. 13) at 10–11.) Defendants also argue that Counts One and Two fail to state a claim, because the POA Declaration expressly permits the 2018 Assignment, therefore, the DCP did not end. (Defs.' Mem. at 11–19.) Additionally, Defendants argue that Count Three fails, because Plaintiffs did not allege anything that would render the Gondola Easement, or the 2013 Supplemental Declaration that created it, invalid or unenforceable. (Defs.' Mem. at 19–26.) Further, Defendants argue that Count Four fails, because Plaintiffs did not allege facts sufficient to show abandonment or waiver of the Gondola Easement. (Defs.' Mem. at 26–28.) Finally, Defendants argue that Count Five fails, because Plaintiffs did not allege facts sufficient to state a claim for slander of title. (Defs.' Mem. at 28–30.)

     On July 14, 2021, Plaintiffs filed their Response in Opposition. On July 28, 2021, Defendants filed their Reply (Defs.' Reply Mem. in Supp. of Mot. to Dismiss the Compl.

Pursuant to Fed. R. Civ. P. 12(b)(6) ("Defs.' Reply" (ECF No. 18))), rendering Defendants' Motion now ripe for review.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint must assert more facts than those "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must suffice to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)

(citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

For the purposes of deciding a motion to dismiss, the Court will only consider those factual allegations set forth in the Complaint. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Additionally, the Court may consider documents attached to the complaint, Fed. R. Civ. P. 10(c), as well as "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Where, as here, the complaint expressly relies upon a document integral to the complaint that the plaintiff did not attach, the Court can also consider that document on a motion to dismiss. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) ("[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'") (quoting *Phillips*, 190 F.3d at 618). Where the bare allegations of the complaint conflict with any document incorporated therein, the document prevails. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

### III.    ANALYSIS

The Court will first address Defendants' threshold argument that the Court must dismiss Plaintiffs' entire Complaint, because Plaintiffs had record notice of the encumbrances and restrictions on their property. Next, the Court will evaluate Counts One and Two attacking the 2018 Assignment of Declarant Rights. Finally, the Court will analyze Counts Three, Four and Five pertaining to the Gondola Easement.

11

## A.   Defendants' Record Notice Argument Fails

Defendants first argue that all five of Plaintiffs' claims fail as a matter of law, because Plaintiffs had record notice of all of the encumbrances and restrictions affecting their property, thereby binding the Plaintiffs. (Defs.' Mem. at 10–11.)  Plaintiffs do not dispute that they had record notice of all of the encumbrances and restrictions at issue before they purchased their parcels. (Pls.' Resp. at 14.)  Instead, Plaintiffs assert that they challenge the validity of the encumbrances as created for fraudulent purposes and unauthorized by the POA Declaration and Gondola Declaration.[1]  (Pls.' Resp. at 14–15.)

Virginia law clearly establishes that "where a party purchases an estate which is subject to the right of another, and that right is shown by the chain of title papers, the purchaser is charged with notice of all that the title paper or papers to which they refer may disclose upon complete examination." *Saffell v. Orr*, 64 S.E. 1057, 1060 (Va. 1909).  "[O]nce a [document] is recorded, the admission to record is in law notice to the entire world." *Porter v. Wilson*, 421 S.E.2d 440, 442 (Va. 1992).  Indeed, the "main purpose" of Virginia's recordation statutes "is to give constructive notice to purchasers and encumbrancers who acquire or seek to acquire some interest or right in property." *Shaheen v. Cty. Of Mathews*, 579 S.E.2d 162, 171 (Va. 2003).  Consequently, a duly recorded instrument in the purchaser's chain of title affords constructive notice to the purchaser and the world of encumbrances, restrictive covenants, declarations and the like.

---

[1]     In their response, Plaintiffs state that they "are essentially asserting a fraudulent conveyance claim to invalidate previously created encumbrances." (Pls.' Resp. at 15.)  The Court construes this statement as Plaintiffs' attempt to characterize their claims rather than an allegation of a theory of recovery under Va. Code Ann. § 55.1-400.  To the extent they now attempt to bring a claim for fraudulent conveyance, they have not pled such a claim in the Complaint.

However, in contrast to this case, the typical situation contemplated by Virginia's recording statutes remains one in which a bona fide purchaser of land without notice of any claims against it needs protection against the grantor's creditors or others who purportedly purchased title from the grantor. 15 Michie's Jurisprudence, Recording Acts § 3 (2021). Here, Plaintiffs admit to having notice of the encumbrances on their land. (Pls.' Resp. at 14.) Instead, they challenge the validity of the encumbrances as created for fraudulent purposes and instituted outside of the authority of the governing documents. (Compl. ¶¶ 114–15, 130.)

It appears to the Court that Virginia case law does not directly address whether a purchaser of encumbered land can challenge the validity of that encumbrance in spite of having record notice of it. Further, neither Plaintiffs nor Defendants presented any cases that address this question. Where, as here, caselaw provides no authoritative decision on an issue of state law, the district courts must resort to predicting the proper state law rule by looking to general principles and other available sources. *Fed. Ins. Co. v. Smith*, 63 F. App'x 630, 632 (4th Cir. 2003).

The Court first looks to Virginia caselaw relevant to the easement abandonment analysis below. *See* discussion *infra* Section III.C.2. In *Hercules Powder Co. v. Continental Can Co.*, the Supreme Court of Virginia reviewed whether the grantor of a decades-old easement proscribing the manufacture of wood pulp created it with a valid purpose in spite of the plaintiff's record notice of the easement. 86 S.E.2d 128, 131–35 (Va. 1955). Although the *Hercules Powder Co.* court found it persuasive that the purchaser had notice of the restriction, it did not find that fact dispositive. *Id.* at 133. Instead, it engaged in a reasonableness analysis in upholding the easement. *Id.* at 131–33. In that case, the court relied on other cases in which the

13

court analyzed the validity of a restriction on property in spite of the party's record notice of the restriction. *Id.* at 132–33.

In *Tardy v. Creasy*, the holder, pursuant to a deeded covenant, of "exclusive mercantile privilege" along a railroad sought to enforce the restriction against a competitor who purchased land in the tract with record notice of the restriction. 81 Va. 553, 555 (1886). The competitor demurred, challenging the validity of the restriction. *Id.* at 555–56. The court invalidated the pre-existing covenant as a general restraint on trade and purely personal to the grantor, not running with the land. *Id.* at 565. Thus, the fact that the challenger had record notice of the encumbrance did not preclude the court from considering the validity of the encumbrance and ultimately invalidating it. *Id.*

And in *Oliver v. Hewitt*, a grantor sought to enforce his deeded non-competition covenant, forbidding the sale of groceries or bottled drinks except for "bottled High Rock" after 6:00 p.m., against a subsequent grantee and subsequent lessee who took the property with record notice of the restriction. 60 S.E.2d 1, 2 (Va. 1950). The court upheld the restrictive covenant as fairly protecting the grantor's interests, reversing the trial court. *Id.* at 4. Again, the court analyzed the validity of the covenant based on its reasonableness rather than whether the challenger had record notice of it. *Id.*

In each of these cases, the Supreme Court of Virginia analyzed the merits of a property restriction rather than blindly enforcing the restriction because one party had record notice of it. Considering these cases and the purpose of the recordation statutes, the Court finds that notice of an encumbrance constitutes a question distinct from whether a party validly imposed that encumbrance at the time of recording. *Cf.* 15 Michie's Jurisprudence, Recording Acts § 3 (2021) ("It is not within the legislative contemplation that a recording act can become either a haven or

14

refuge for a fraudulent grantor or a shield of defense for a grantee in bad faith.") (citing *Bank of Marlinton v. McLaughlin*, 1 S.E.2d 251, 254 (W. Va. 1939)). Indeed, to find otherwise would shield many encumbrances from a reasonableness review—even those enacted in violation of public policy—as recordation could cure any invalidity in an easement under a defendant's authority.

For these reasons, Defendants' argument that the Court should dismiss Plaintiffs' entire Complaint on the basis of Plaintiffs' record notice of the property restrictions fails.

## B.    Counts One and Two: The 2018 Assignment of Declarant Rights

The Court next turns to an issue of contract interpretation. Counts One and Two attack the 2018 Assignment of Declarant Rights that occurred in the month preceding the tax sale. Defendants argue that Plaintiffs' first two claims fail as a matter of law, because the POA Declaration expressly allowed the 2018 Assignment, therefore, the Declarant Control Period did not end. (Defs.' Mem. at 11–19.) Plaintiffs dispute Defendants' interpretation of the POA Declaration, asserting that an assignment of Declarant Rights must occur in conjunction with a transfer of property interests and only confer Declarant Rights specifically associated with those parcels.[2] (Pls.' Resp. at 15–21.)

In interpreting the POA Declaration, the Court must ask the question "what did [the parties] agree to as evidenced by their contract[?]" *Stonega Coke & Coal Co. v. Louisville &*

---

[2]    As a preliminary matter, the Court finds that, consistent with Plaintiffs' unopposed assertion, the POA Declaration constitutes a contract to which the parties became bound when they acquired land within the Project. (Compl. ¶¶ 118–19; POA Decl. Recitals ("NOW, THEREFORE, the Association, with the consent and joinder of the Declarant and the Additional Owners, hereby covenants and declares, on behalf of itself, all Owners and its and their respective successors and assigns, that the land described on Exhibits A and A-1, shall, from the date this Declaration is recorded, be held, conveyed, acquired and encumbered subject to the terms and provisions hereof . . . .").)

*N.R. Co.*, 55 S.E. 551, 552 (Va. 1906). In construing written documents, Virginia "adhere[s] to the 'plain meaning' rule." *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983). Accordingly, "where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Globe Iron Constr. Co. v. First Nat'l Bank of Bos.*,140 S.E.2d 629, 633 (Va. 1965). Rather, "the writing is the repository of the final agreement of the parties." *Id.* "[C]ourts cannot read into contracts and conveyances language which will add to or take from the meaning of the words already contained therein." *Virginian Ry. Co. v. Avis*, 98 S.E. 638, 640 (Va. 1919). "Determining the nature of an interest in land [granted in a written, recorded document] is a question of law." *Appalachian Power Co. v. Nissen*, 2015 WL 1883647, at *4 (W.D. Va. Apr. 24, 2015) (citing *Bailey v. Town of Saltville*, 691 S.E.2d 491, 493 (Va. 2010)).

In support of their position that the POA Declaration permits the 2018 Assignment of Declarant Rights, Defendants advance two arguments: (1) the Declarant need not execute a transfer of Declarant Rights simultaneously or in conjunction with the transfer of title to property within the project, and (2) a "Person" need not own the particular parcel to hold the Declarant Rights regarding that parcel. (Defs.' Mem. at 13–17.) With regard to the first argument, the Court finds, to the contrary, that the plain language of the POA Declaration requires that the Declarant may only transfer Declarant Rights in conjunction with a transfer of title. Plaintiffs have alleged that the Declarant transferred Declarant Rights to entities not in the process of acquiring title at the time of transfer. These facts sufficiently allege that the 2018 Assignment violated the POA Declaration, rendering review of Defendants' second argument unnecessary.

Defendants further argue that Counts One and Two fail to state a claim because the 2018 Assignment or Defendants' construction of the POA Declaration did not infringe Plaintiffs'

16

rights.  Again, the Court finds to the contrary.  Plaintiffs allege that if the Court found the 2018

Assignment invalid, the Declarant Control Period would end pursuant to Section 5.2(d) of the

POA Declaration, significantly altering Plaintiffs' rights with regard to their parcels and the

power of their vote in the Association.  Reading these facts in the light most favorable to

Plaintiffs, Plaintiffs have alleged sufficient facts to state a claim in Counts One and Two.

### 1.   The Declarant may only transfer Declarant Rights in conjunction with a transfer of title

In this case, the plain meaning of the POA Declaration proves clear.  The Court finds that

the parties intended — as evidenced by their contract — to restrict assignments of Declarant

Rights, such as, and including, the 2018 Assignment of Declarant Rights, to only those persons

in the process of acquiring title to parcels within the Project.

Article 5 of the POA Declaration empowers the transfer of Declarant Rights and

discusses the implications thereof.  In construing Article 5, the Court must read the contract as a

whole and not read any subsection in isolation:

> The court must give effect to all of the language of a contract if its parts can be read
> together without conflict.  Where possible, meaning must be given to every clause.
> The contract must be read as a single document.  Its meaning is to be gathered from
> all its associated parts assembled as the unitary expression of the agreement of the
> parties.

*Berry*, 300 S.E.2d at 796 (citing *Quesenberry v. Nichols*, 159 S.E.2d 636 (Va. 1968)).

After defining Declarant Rights in Section 5.1, Article 5 generally authorizes the transfer

of Declarant Rights to a successor declarant in Section 5.2(a).  The authorization contains

internal limitations that restrict how a Declarant may transfer Declarant Rights.  Article 5 then

proceeds to discuss the liability implications of transferring Declarant Rights, as well as the

implications for Declarant Rights and the Declarant Control Period if the Declarant faces a

forced sale of some or all of its property.  (POA Decl. § 5.2(b)–(e).)  In construing the contract as

a whole, the Court must harmonize the various provisions by reading the forced sale sections in light of the general grant of power to transfer Declarant Rights in Section 5.2(a).

In relevant part Section 5.2 states:

(a)     The Declarant may transfer Declarant Rights (or any of them) to any Person acquiring Parcels by an instrument evidencing the transfer of Declarant Rights and recorded among the Land Records. A partial transfer of Declarant Rights does not prevent the transferor declarant from continuing to unilaterally exercise Declarant Rights with respect to land retained by such transferor declarant or from making other such transfers.

. . . .

(c)     Unless otherwise provided in a Mortgage, in case of foreclosure (or deed in lieu of foreclosure), tax sale, judicial sale, sale by a trustee under a deed of trust or sale under the Bankruptcy Code or receivership proceedings, of any Parcels owned by a declarant, a Person acquiring title to all the Parcels being foreclosed or sold, but only upon such Person's request, succeeds to all Declarant Rights related to such Parcels or to such Declarant Right [sic] as requested. The judgment, instrument conveying title or other instrument recorded in the Land Records shall provide for transfer of only the Declarant Rights requested.

(d)     Upon foreclosure (or deed in lieu of foreclosure), tax sale, judicial sale, sale by a trustee under a deed of trust, or sale under the Bankruptcy Code or receivership proceedings, of all Parcels owned by a declarant (1) the declarant ceases to have any Declarant Rights, and (2) the Declarant Control Period terminates unless the judgment, instrument conveying title or other instrument recorded among the Land Records provides for transfer of Declarant Rights held by that declarant to a successor declarant. A successor to all Declarant Rights . . . may declare the intention in an instrument recorded in the Land Records to hold those rights solely for transfer to another Person. Thereafter, until transferring all Declarant Rights to any Person acquiring title to any Parcels owned by the successor, or until recording an instrument permitting exercise of all those rights, that successor may not exercise any of those rights other than any right held by the transferor to vote as the Class B Member . . . .

(POA Decl. § 5.2.)

Defendants contend that Plaintiffs fail to state a claim in Counts One and Two, because the POA Declaration expressly allows for the 2018 Assignment of Declarant Rights even though it did not occur in conjunction with a transfer of land. Defendants rely on inferences from the

forced sale provisions, Sections 5.2(c) and (d), without reading those references to the assignment of Declarant Rights in light of Section 5.2(a), which authorizes the transfer of Declarant Rights and imposes an important limiting factor.

Section 5.2(a) imposes a requirement that any transfer of Declarant Rights must occur in conjunction with the transfer of title to parcels. It provides that the Declarant may transfer all or some of its Declarant Rights by a recorded instrument to any "Person acquiring Parcels." In relevant part, Section 5.2(a) states, "The Declarant may transfer Declarant Rights (or any of them) to any Person acquiring Parcels by an instrument evidencing the transfer of Declarant Rights and recorded among the Land Records."[3] (POA Decl. § 5.2(a).)

Plaintiffs and Defendants disagree over the meaning of the present participle "acquiring" in the context of Section 5.2(a). Plaintiffs allege that, in this context, it requires that the transfer of Declarant Rights must occur while the recipient remains in the process of acquiring parcels. (Compl. ¶ 64.) Defendants counter that it does not imply any timing requirements, because a present participle "is a non-finite verb" and it merely "is being used as an adjective phrase" to

---

[3]    Section 5.2(a)'s second clause pertains to the partial transfer of Declarant Rights to a Person acquiring Parcels. The clause operates to protect the right of the Declarant to unilaterally exercise Declarant Rights to the parcels that it retains. It does not alter the transferee limitation in the preceding sentence. Nothing in the second clause suggests the Declarant may transfer Declarant Rights to anyone other than a "Person acquiring Parcels."
    The second clause states that "[a] partial transfer of Declarant Rights does not prevent the transferor declarant from continuing to unilaterally exercise Declarant Rights with respect to land retained by such transferor declarant or from making other such transfers." (POA Decl. § 5.2(a).)
    By implication, a partial transfer suggests that the Declarant may partially retain Declarant Rights to a parcel that it no longer owns. While this may go to the second prong of Defendants' argument — that a "Person" need not own the particular parcel to hold the Declarant Rights regarding that parcel — the Court need not evaluate that argument in full. Plaintiffs have sufficiently alleged that the 2018 Assignment violated the POA Declaration by stating that the Successor Declarants did not qualify as "Persons acquiring Parcels" at the time of transfer of Declarant Rights.

modify the noun "Person." (Defs.' Mem. at 13 (citing *Merriam-Webster Dictionary Online*).)
Instead, the phrase "Person acquiring Parcels," Defendants assert, essentially requires that "the
'Person' must own or be in the process of owning Parcels before the Declarant may transfer
Declarant Rights to that Person." (Defs.' Mem. at 14.) At bottom, Defendants argue that the
Court should not read "Person acquiring Parcels" literally, but only for the limiting principle of
ownership of land within the Project, regardless of when it occurred. And, because the entities to
which the Foreclosure Defendants transferred the Declarant Rights already owned parcels, the
POA Declaration authorized the transfer.

In English grammar, a participle constitutes "[a] non-finite part of a verb, used either
[1] in compound verb forms with an auxiliary verb expressing tense and voice, or [2] as an
adjective." *Participle, Oxford English Dictionary* online, (last visited October 4, 2021).[4] A
present participle, then, either (1) creates the progressive tense when compounded with an
auxiliary verb, or (2) appears "on its own as an adjective with active sense." *Present Participle,
Oxford English Dictionary* online, (last visited October 4, 2021).[5] For example, "the choir was
singing" combines the auxiliary verb "was" with the present participle "singing" to describe a
progressive or continuing action. As the non-finite part of the verb, the present participle
"singing" does not show time apart from the finite auxiliary verb "was." The finite verb "was"
indicates that the continuing act of singing occurred in the past. Alternatively, one can use the
present participle as an adjective that indicates activity, such as "the singing choir." As an
adjective, the present participle describes the noun based on the active process that it performs.

---

[4]   Available at https://www.oed.com/view/Entry/138252.
[5]   Available at https://www.oed.com/view/Entry/150679.

Here, the phrase "Person acquiring Parcels," does not implicate the progressive tense, because the participle does not combine with an auxiliary verb. Rather, the clause uses "acquiring" as a part of a participial phrase, "acquiring Parcels," that functions as an "adjective with active sense" modifying "Person." This means that a person in the process of acquiring parcels stands as the only proper transferee of Declarant Rights. Moreover, the provision does not leave us to speculate when the transferee must stand in the active process of acquiring parcels. Only one finite verb appears in the sentence to which the participial phrase can relate — "transfer." Accordingly, the transferee must remain in the process of obtaining title to parcels within the Project at the time of the transfer of Declarant Rights.

Thus, "acquiring Parcels" operates as a limit on what kind of person qualifies to receive a transfer of Declarant Rights:  a person in the active process of acquiring title to land within the Project. Defendants assertion otherwise strains the plain meaning of the phrase. "Person acquiring Parcels" simply cannot refer to a preexisting owner of land within the Project, unless that person also remains in the process of acquiring more parcels at the time of transfer.

Further still, the POA Declaration only contains one clause authorizing the transfer of "Declarant Rights" inclusively — Section 5.2(a). No other provision of the contract enables the Declarant to assign or transfer Declarant Rights as a whole.[6] Because the plain language of the

---

[6]     Other than Section 5.2, the POA Declaration only refers to the transfer of rights as follows. Section 2.3 discusses the Declarant's transfer to the Association of the responsibility for "Upkeep" of the Association Area. Section 3.2 allows the Declarant to share or assign its Article 3 ("Easements") "Development Rights" with one or more persons. Although the "Declarant Rights" broadly include the specific Article 3 right to grant certain easements, this transfer provision in Section 3.2 applies only to the transfer of that specific easement right. This contrasts with Section 5.2, which refers to "Declarant Rights" inclusively. Thus, Section 3.2 does not broaden the "Person acquiring Parcels" limitation in Section 5.2 that applies when the Declarant transfers Declarant Rights beyond easement rights. Reading these provisions together, when the Declarant solely transfers easement "Development Rights" it may do so to any person,

POA Declaration does not authorize any other means of transfer, the Court finds that the parties only intended to authorize transfer of Declarant Rights to a "Person acquiring Parcels."

Defendants primarily rely on Sections 5.2(c) and (d) to argue that no timing requirement exists for a proper transfer of Declarant Rights. However, their arguments ignore the general limitation imposed by the transfer of Declarant Rights empowering clause in Section 5.2(a) and make inappropriate inferences from silence. Significantly, Sections 5.2(c) and (d) do not purport to specify how a transfer of Declarant Rights must occur; these sections focus on the consequences of the forced sale of land owned by the Declarant.

Section 5.2(c) applies in a scenario where the Declarant faces the forced sale of any of its land. It provides that a person, who acquires title to all of the foreclosure parcels, may request transfer of any or all Declarant Rights related to the foreclosure parcels. If the person so requests, and the foreclosure documents do not otherwise provide, that person succeeds to those Declarant Rights. Section 5.2(c) provides:

> (c)      Unless otherwise provided in a Mortgage, in case of foreclosure (or deed in lieu of foreclosure), tax sale, judicial sale, sale by a trustee under a deed of trust or sale under the Bankruptcy Code or receivership proceedings, of any Parcels owned by a declarant, a Person acquiring title to all the Parcels being foreclosed or sold, but only upon such Person's request, succeeds to all Declarant Rights related to such Parcels or to such Declarant Right [sic] as requested. The judgment, instrument conveying title or other instrument recorded in the Land Records shall provide for transfer of only the Declarant Rights requested.

(POA Decl. § 5.2(c).)

---

but when transferring Declarant Rights more broadly than easement rights, it may only do so to a person in the process of acquiring parcels.

Continuing with the other provisions, Section 3.5 establishes a mutual non-exclusive permanent easement and right of way among each parcel owner for foot and bicycle trails through the Project and voids any transfer of such rights and easements. Section 15.2 alludes to the transfer of the Association's easements, rights or interests as a part of termination of the Association. None purport to bear upon or alter the transfer of Declarant Rights provision, Section 5.2.

Importantly, Plaintiffs do not allege that they obtained Declarant Rights under Section 5.2(c) as tax sale purchasers. Rather, Defendants raise Section 5.2(c) to argue that, because the provision refers to the transfer of Declarant Rights by "other instrument recorded in the land records," the Declarant can divorce the transfer of Declarant Rights from the acquisition of parcels. (Defs.' Mem. at 12.) This argument proves futile.

To begin, the sentence that Defendants draw upon does not purport to delineate how a transfer of Declarant Rights may occur. It provides no indication that it authorizes a distinct type of Declarant Rights transfer. It merely operates to specify which Declarant Rights the Declarant must transfer following a purchaser's acquisition of all foreclosure parcels, unless otherwise provided — those specifically requested by the purchaser.

Moreover, Section 5.2(c)'s "other instrument" language does not contradict Section 5.2(a). Section 5.2(a) simply provides that a transfer, to a person acquiring parcels, may occur by "an instrument . . . recorded among the land records." This language leaves open the possibility that the transfer could occur simultaneously and in the same document as the acquisition of title, or it could occur in a distinct document, so long as the transferee records it and that person remains in the process of acquiring parcels. Section 5.2(c) reads similarly: the Declarant can transfer Declarant Rights in the document transferring title pursuant to the forced sale or can do so independently in an "other instrument."

Defendants also employ Section 5.2(d) in support of their same flawed argument. Section 5.2(d) pertains to a scenario in which the Declarant faces the forced sale of all of its parcels; accordingly, it applies to the case at hand. It provides that upon such sale, one of two scenarios can occur. In the default scenario, the Declarant loses its Declarant Rights, thereby terminating the Declarant Control Period. However, the Declarant Control Period does not

23

terminate if the Declarant transfers its Declarant Rights and records that instrument.  In relevant part, Section 5.2(d) provides:

> (d)      Upon foreclosure (or deed in lieu of foreclosure), tax sale, judicial sale, sale by a trustee under a deed of trust, or sale under the Bankruptcy Code or receivership proceedings, of all Parcels owned by a declarant (1) the declarant ceases to have any Declarant Rights, and (2) the Declarant Control Period terminates unless the judgment, instrument conveying title or other instrument recorded among the Land Records provides for transfer of Declarant Rights held by that declarant to a successor declarant.

(POA Decl. § 5.2(d).)

Again, Defendants ignore Section 5.2(a) and draw from a clause that does not have the purpose of authorizing new means of transferring Declarant Rights.  Defendants repeat their argument that the transfer of Declarant Rights need not occur in conjunction with the transfer of title to parcels, because Section 5.2(d) allows for transfer of Declarant Rights by "other instrument" — an instrument other than the one conveying title as a part of the forced sale.  Once more, the Court must read this provision in light of Section 5.2(a).  Within this general grant of authority to transfer Declarant Rights, the contract imposes the requirement that the transferee of Declarant Rights must remain in the process of acquiring parcels within the Project at the time of transfer.  Moreover, like in Section 5.2(c), the "other instrument" language stands in harmony with Section 5.2(a), not in contradiction to it.

In the context of the POA Agreement as a whole, Section 5.2(d) states that the Declarant may avoid termination of the Declarant Control period by transferring Declarant Rights to the foreclosure purchaser of all parcels, who must specifically request such rights pursuant to Section 5.2(c), or to another successor declarant, so long as that successor declarant constitutes a Person acquiring parcels pursuant to Section 5.2(a), whether that process stands as a part of the forced sale or a separate acquisition.

24

Finally, with regard to Sections 5.2(c) and (d), Defendants capitalize on the fact that neither include any language imposing a time limit on when the Declarant may execute or record the "other instruments" transferring Declarant Rights — but they do not have to. The Court will not, as Defendants suggest, draw inferences from what the contract could have said. (Defs.' Mem. at 12.) The language that the POA Declaration employs speaks clearly. *See Globe Iron Const. Co.*, 140 S.E.2d at 633 ("[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself."). Section 5.2(a) provides the limiting principle for all transfers of Declarant Rights when it authorizes their transfer in the first place — to those persons in the process of acquiring parcels. Moreover, the POA Declaration does not otherwise authorize the transfer of Declarant Rights in any other provision of the contract. *See supra* note 6 and accompanying text. This leads the Court to interpret Section 5.2(a) as the only grant of power to transfer Declarant Rights. Thus, the Court must read any reference to the transfer of Declarant Rights as a part of a foreclosure sale with the limitation of Section 5.2(a).

Additionally, Defendants look beyond the four corners of the POA Declaration to support their argument that the Declarant need not transfer Declarant Rights simultaneously or in conjunction with the transfer of title to property within the Project. (Defs.' Mem. at 14.) They allege that a 2011 Declarant Rights Transfer supports their reading of Article 5 by showing a transfer of Declarant Rights that occurred in a manner not simultaneous or in conjunction with the acquisition of a parcel by the transferee.[7] However, the Court will not consider evidence of course of performance to uphold a construction of the contract that conflicts with its express

---

[7]     The Court makes no findings with regard to the validity of the 2011 Declarant Rights Transfer, because the Plaintiffs do not challenge it in this case.

25

language. *Cf. Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 9 (4th Cir. 1971) ("[T]he Uniform Commercial Code restates the well-established rule that evidence of usage of trade and course of dealing should be excluded whenever it cannot be reasonably construed as consistent with the terms of the contract."); Va. Code Ann. § 8.1A-303 (where the express terms of an agreement conflict with any applicable course of performance, "express terms prevail over course of performance, course of dealing, and usage of trade"). Article 5 clearly limits transfer of Declarant Rights to persons who actively stand in the process of acquiring parcels. The Court finds it unreasonable to construe "Person acquiring Parcels" to mean any owner of parcels within the Project. Accordingly, the Court rejects Defendants attempt to invoke past practices to interpret Section 5.2(a).

In sum, the Court finds that the POA Declaration restricts transfers of Declarant Rights to only those persons in the process of acquiring title to parcels within the Project.

### 2. The 2018 Assignment affects Plaintiffs' rights

Defendants next argue that Plaintiffs cannot challenge the 2018 Assignment, because it does not affect Plaintiffs' rights or reasonable expectations. (Defs.' Mem. at 17–19.) In support of this position, Defendants state that (1) the POA Declaration did not entitle Plaintiffs to receive Declarant Rights as a result of the tax sale, and (2) the 2018 Assignment did not alter the Association's voting structure. (Defs.' Mem. at 17–19.)

However, Defendants mischaracterize Plaintiffs' claim. Plaintiffs do not allege entitlement to Declarant Rights. (Pls.' Resp. at 21.) Instead, Plaintiffs argue that the 2018 Assignment did not comport with Section 5.2(a) and, therefore, the Foreclosure Defendants did not effectively transfer their Declarant Rights before the forced sale of all of their land. (Pls.' Resp. at 21.) Accordingly, the tax sale terminated the Declarant Control Period as provided by

26

Section 5.2(d). (Pls.' Resp. at 21.) Specifically, Plaintiffs allege that the 2018 Assignment "obstruct[ed] owners of property within the Project, including the Plaintiffs, from assuming control of the Association and development of the Project as contemplated by the Declaration upon the termination of the Declarant Control Period." (Compl. ¶ 69.)

Reading the Complaint in the light most favorable to the Plaintiff, the Court finds that these allegations demonstrate harm to Plaintiffs and give them sufficient interest to challenge the 2018 Assignment. Accordingly, the Court need not address whether the transfer of Declarant Rights altered the Association's voting structure, additionally harming Plaintiffs.

In conclusion, Plaintiffs have sufficiently stated a claim in Counts One and Two. The POA Declaration requires any transfer of Declarant Rights to occur in conjunction with the act of acquiring parcels. Plaintiffs allege that the Successor Declarant Defendants had concluded the process of acquiring parcels before the time of the transfer, thereby rendering the 2018 Assignment void. (Compl. ¶ 64.) Accordingly, the Court hereby DENIES Defendants' Motion to Dismiss with regard to Counts One and Two.

### C.    The Gondola Easement

Counts Three through Five relate to the Gondola Easement. In Count Three, Plaintiffs allege, and seek declaratory judgment stating, that the Supplemental Declaration and Gondola Easement prove invalid and unenforceable, petitioning the Court to quiet title of the parcels encumbered by the Gondola Easement. (Compl. ¶¶ 128–31.) In Count Four, Plaintiffs allege, and seek declaratory judgment stating, that the Gondola Declarant terminated the Gondola Easement via abandonment, thereby waving its right to enforce the easement against Plaintiffs. (Compl. ¶¶ 128–35.) In Count Five, Plaintiffs allege a slander of title claim arising from CVAS Property Management's representation of its rights to the Gondola Easement in the December 15

27

Letter. (*Id.* ¶¶ 136–38.) Based on this claim, Plaintiffs seek an award of damages and an order enjoining CVAS Property Management from attempting to enforce the 2013 Supplemental Declaration and Gondola Easement. (Compl. at 35.) The Court will address each Count in turn.

1.      **Count Three:  The Gondola Easement's validity and enforceability**

In support of their Motion to Dismiss, Defendants argue that Count Three fails as a matter of law, because Plaintiffs' Complaint fails to allege anything that would render the Gondola Easement, or the 2013 Supplemental Declaration that established it, invalid or unenforceable. (Defs.' Mem. at 19–26.) Specifically, Defendants argue that the Gondola Easement, and the Supplemental Declaration that created it, prove valid and enforceable as a matter of law, because they reasonably restrict property rights, serve a legitimate purpose and do not violate public policy. (Defs.' Mem. at 19–22.) Additionally, Defendants argue that the Gondola Easement proves valid, because it does not demonstrate vagueness, over-breadth or ambiguity. (Defs.' Mem. at 22–24.) Finally, Defendants argue that the Gondola Easement does not violate its authorizing documents and Plaintiffs mistakenly rely on the wrong documents in claiming that it does. (Defs.' Mem. at 24–26.)

*a)      The Gondola Easement serves a valid purpose*

The Court finds that, as a matter of law, the Gondola Easement and the 2013 Supplemental Declaration that created it prove reasonable both presently and when imposed.

In Virginia, a restriction on the use of property proves valid and enforceable so long as (a) it proves reasonable between the parties and (b) does not violate public policy by harming the public. *Hercules Powder Co.*, 86 S.E.2d at 131 (citing *Merriman v. Cover, Drayton & Leonard*, 51 S.E. 817 (Va. 1905); *Oliver*, 60 S.E.2d at 1; *Carneal* v. *Kendig*, 85 S.E.2d 235 (Va. 1955)). An encumbrance proves reasonable if such a restriction fairly protects "the interest of the party

28

in favor of whom it is given." *Id.* at 131–33.  To determine this, the Court must assess the purpose and actual operation of the encumbrance under the circumstances and conditions, both when imposed and at present.  *Id.*

Plaintiffs allege that the Gondola Easement and the 2013 Supplemental Declaration that created it operated solely to frustrate the foreclosure of certain parcels within the Project, and to hinder and obstruct the development of Plaintiffs' property. (Compl. ¶¶ 98, 129.)  In support of this position, Plaintiffs cite the timing of the easement's creation.  Specifically, Plaintiffs allege that the Gondola Declarant created the Gondola Easement and the 2013 Supplemental Declaration after the Foreclosure Defendants had defaulted on the special assessments and after the City had filed the 2013 Foreclosure Action.  (Compl. ¶¶ 74, 129.)  Defendants counter that the Gondola Easement remains valid, because it protects Defendants' business interests in developing the Project, which stands as a reasonable purpose under Virginia law.  (Defs.' Mem. at 20–21.)

First, in terms of the purpose of the restraint in the circumstances and conditions at the time and at present, the Court finds that the restrictions served valid and reasonable business purposes.  In *Hercules Powder Co.*, the Supreme Court of Virginia upheld a property restriction as reasonable based on the valid and reasonable purpose of protecting a business interest.  86 S.E.2d at 133.  There, the plaintiff challenged a thirty-year-old restriction on its servient property requiring that it would not use the land for the manufacture of wood pulp.  *Id.* at 130.  The restriction operated for the benefit of the defendant, who held the dominant parcel and manufactured paper and board from wood pulp on its property.  *Id.*  Plaintiff argued that the restriction proved unnecessary at the time of implementation, because there remained then an ample supply of pulpwood and, therefore, the restriction had no valid purpose when imposed.

*Id.* at 131.  As to the time of imposition, the court found that the business judgment underlying

the restriction constituted a valid and reasonable purpose — despite the fact that it seemed

unnecessary then.  *Id.* at 133.  As to the restriction's present enforcement, the court accepted that

protecting the defendant's business interests of securing an adequate pulpwood supply

constituted a valid and reasonable purpose.  *Id.*

  In this case, like in *Hercules Powder Co.*, the property restraint protects the Gondola

Declarant's business interests.  Plaintiffs themselves have alleged that the Gondola Declarant's

ability "to develop and manage development within the Project was . . . seriously at risk due to

the foreclosure sales that would be held." (Compl. ¶ 79.)  Therefore, given the possibility of

foreclosure and risk to the Gondola Declarant's development interests, it proved reasonable for

the Gondola Declarant to impose the Gondola Easement to ensure that it retained its ability to

achieve its development interests, including constructing the Gondola Facility.

  Although Plaintiffs allege that the Gondola Easement solely purposed to frustrate and

obstruct Plaintiffs, the Court need not accept that statement as true.  (Compl. ¶¶ 98, 129.)  The

allegation stands plainly contradicted by a document Plaintiffs incorporated into their Complaint.

Where the bare allegations of the complaint conflict with any document incorporated therein, the

document prevails.  *Fayetteville Invs.*, 936 F.2d at 1465.  On page one, the Gondola Declaration

expressly states that the overarching purpose for all covenants, conditions and restrictions on

property within the Project remains "preserving the value of the [Project] and the unified nature

of the improvement and operating thereof." (Gondola Decl. at 1.)  Additionally, in furtherance

of this purpose, the Gondola Declaration stated the intent to construct a Gondola Facility in the

future.  (Gondola Decl. ¶ 9.)  As a matter of law, preserving the value and unified development

of the Project constitutes a valid and protectable business interest.  Thus, the restraint stood

reasonable when imposed. Because its purpose has not changed, the Gondola Easement continues to have a reasonable purpose as a matter of law.

Second, in terms of the actual operation of the restriction in the circumstances and conditions at the time and at present, the Court finds that the restriction proves fair between the parties. Plaintiffs, who purchased their parcels in 2018, received record notice of both the express easement as of 2013, when created, and the need for an easement within the Project as of 2005, when the Gondola Declaration gave the Gondola Declarant the right to construct a Gondola Facility. *See Hercules Powder Co.*, 86 S.E.2d at 133 (noting plaintiff acquired its land with notice of the restriction in finding the restriction fair and reasonable). Again, "once a [document] is recorded, the admission to record is in law notice to the entire world." *Porter*, 421 S.E.2d at 442. The "main purpose" of Virginia's recordation statutes "is to give constructive notice to purchasers and encumbrancers who acquire or seek to acquire some interest or right in property." *Shaheen*, 579 S.E.2d at 171. Because the restriction proves valid in its purpose and operation, the Court finds the restriction reasonable between the parties.

Additionally, the Court finds that the property restriction does not infringe public policy interests. Plaintiffs do not allege that the easement violates public policy. Indeed, the Gondola Easement only encumbers land within the Project, a private, unified development. Plaintiffs merely allege harm to their economic interests in their ability to develop, use or sell their encumbered parcel. (Compl. ¶¶ 96, 98, 108). This allegation carries no weight in the public policy analysis. *See Hercules Powder Co.*, 86 S.E.2d at 132 (noting that a $5 million loss to the plaintiff "can hardly be said to concern the public") (finding the property restriction did not violate public policy, because it did not ban the plaintiff entering the wood pulp business

generally but applied only to 389 acres in Hopewell).  Accordingly, the Gondola Easement and 2013 Supplemental Declaration that created it do not violate public policy as a matter of law.

Because the Gondola Easement and 2013 Supplemental Declaration prove reasonable between the parties and do not violate public policy, the Court finds that they stand valid and enforceable.

### b)  *The Gondola Easement proves not vague, overly broad or ambiguous*

The Court finds that, as a matter of law, the Gondola Easement and the 2013 Supplemental Declaration that created it proves not vague, overly broad or ambiguous.

In Virginia, an easement proves not void or unenforceable for vagueness, overbreadth or ambiguity even if the language of the easement allows the easement-holder to alter the easement in the future without including specifics. *See Adamson v. Columbia Gas Transmission, LLC*, 987 F. Supp. 2d 700, 704–05 (E.D. Va. 2013) (finding an easement enforceable even though the easement allowed for future change but did not state any specifics or limitations on those possible future changes), *aff'd*, 579 F. App'x 175 (4th Cir. 2014); *Anderson v. Delore*, 683 S.E.2d 307, 310 (Va. 2009) ("A deed may expressly create an [enforceable] easement but fail to define specifically its dimensions.").

Plaintiffs allege that the 2013 Supplemental Declaration that created the Gondola Easement "is overly broad, vague, and ambiguous and, therefore unenforceable." (Compl. ¶ 130.)  In support, Plaintiffs point to Exhibit A to the 2013 Supplemental Declaration, a plat depicting the Gondola Easement Area.  Plaintiffs argue that although Exhibit A "creates the appearance that the location of the 'Gondola Easement Area' is fixed, a close examination of the provisions of the 2013 Supplemental Declaration reveals otherwise." (Compl. ¶ 93.)  Plaintiffs then cite Paragraph Three of the 2013 Supplemental Declaration that "expressly reserves the

right to reconfigure, relocate, modify and/or release any portion, or the entirety, of the Gondola Easement at any time hereafter" without requiring approval or consent of an owner of land within the Project.  (Compl. ¶ 94; 2013 Suppl. Decl. ¶ 3.)  Plaintiffs allege that the Gondola Easement and right to relocate it give CVAS Property Management "the unfettered ability to control and regulate development within the Project."  (Compl. ¶ 96.)  Accordingly, Plaintiffs conclude, "there is no legitimate purpose or function" for the purported Gondola Easement. (Compl. ¶ 97.)

As discussed in the preceding analysis, the Court finds that Defendants' business interests prove a valid and reasonable purpose for controlling and regulating development within the Project. *See* discussion *supra* Section III.C.1.a.  Again, the Court need not accept as true Plaintiffs' allegations that the 2013 Supplemental Declaration "was created with a malicious intent to impair Plaintiffs' property rights."  (Pls.' Resp. at 25; Compl ¶ 98.)  This allegation stands plainly contradicted by the Gondola Declaration, which Plaintiffs incorporated into their complaint.  According to that document, all restrictions on the use of land within the Project operate to preserve the value and unified development of the Project, which Virginia recognizes as a valid and protectable business interest.  (Gondola Decl. at 1.)  Because these statements conflict, the document attached to the complaint controls.  *Fayetteville Invs.*, 936 F.2d at 1465. Accordingly, the Court cannot accord weight to Plaintiffs' speculative assertion of Defendants' malicious intent.

Additionally, the Court finds that the Gondola Easement itself, and the 2013 Supplemental Declaration that created it, prove not void and unenforceable for vagueness or ambiguity.  The 2013 Supplemental Declaration defines the location of the Gondola Easement in Paragraphs Two and Three and shows its location in Exhibit A.  (2013 Suppl. Decl. at 2, Ex. A.)

33

Although the declaration subjects the easement and its location to the Gondola Declarant's right to modify or release it as necessary for future development, this does not render the restriction unenforceable. In Virginia, an easement may allow for future indeterminate alteration without rendering the restriction unenforceable. *Adamson*, 987 F. Supp. 2d at 704–05. In such a situation, the object or purpose of the easement, as set out in its granting language, provides the limiting principle on its future modification. *Anderson*, 683 S.E.2d at 310. Here, the easement proposes to preserve the value and unified development of the Project. (Gondola Decl. at 1.) The implementation of such purpose constitutes a business judgment that the Court will not disturb. *Cf. Hercules Powder Co.*, 86 S.E.2d at 133.

Accordingly, the Court finds that the Gondola Easement and the 2013 Supplemental Declaration that created it prove not void for vagueness, ambiguity, or overbreadth.

> c)       ***The Gondola Declaration, POA Declaration and LOM do not invalidate the Gondola Easement***

The Court further finds that any alleged inconsistencies with the Gondola Declaration, POA Declaration or LOM do not invalidate the Gondola Easement and the 2013 Supplemental Declaration. In resolving disputes regarding the purpose and scope of an express easement, Virginia applies the customary rules governing the construction of written documents. *Anderson*, 683 S.E.2d at 309–10. Thus, the Court must look to the words set forth in the document that created the easement. *Id.* (citing *Pyramid Dev., L.L.C. v. D&J Assocs.*, 553 S.E.2d 725, 728 (Va. 2001); *Cushman Virginia Corp. v. Barnes*, 129 S.E.2d 633, 639 (Va. 1963); *Hamlin v. Pandapas*, 90 S.E.2d 829, 833 (Va. 1956)).

First, Plaintiffs allege that the Gondola Easement and the 2013 Supplemental Declaration that created it conflict with the Gondola Declaration. (Compl. ¶ 131.) Specifically, Plaintiffs argue that the Gondola Declaration established the purpose of the Gondola Facility to facilitate

the "aerial transportation from the [Project] across the Rappahannock River to a station within the Celebrate Virginia North Development and back again." (Compl. ¶ 131 (quoting Gondola Declaration ¶ 9).) However, as created eight years later, Plaintiffs continue, the Gondola Easement Area "bears no connection or relation to the purpose of the Gondola Facility as established in the [Gondola Declaration]." (Compl. ¶¶ 89, 131.) Rather than approaching the Rappahannock River to link the Project to the Celebrate Virginia North Development, the Gondola Easement Area could only "at best . . . be regarded as a means of internal circulation within the Project." (Compl. ¶ 91.)

Plaintiffs' argument falls flat. The instrument that creates the easement establishes its scope and purpose. *Anderson*, 683 S.E.2d at 309–10. Here, the 2013 Supplemental Declaration established the Gondola Easement, not the Gondola Declaration. The Gondola Declaration established the Gondola Declarant's right to create the Gondola Easement, placing its location, design and operation in the sole discretion of the Gondola Declarant. (Gondola Decl. ¶ 9.) It further acknowledged the Gondola Declarant's then-existent intent to use the Gondola to facilitate transportation across the river. (Gondola Decl. ¶ 9.) However, the 2013 Supplemental Declaration actually exercised that right to create the easement and did so with a different purpose than originally contemplated.

The 2013 Supplemental Declaration grants the Gondola Easement in Paragraph Two, describes the related rights in Paragraph Three and depicts the Gondola Easement Area in Exhibit A. Paragraph Two establishes the purpose for the Gondola Easement without any reference to transportation across the Rappahannock River. The 2013 Supplemental Declaration also affirmed "that the location, design and operation of the Gondola Facility are all in [the Gondola] Declarant's sole discretion." (2013 Suppl. Decl. at 1.)

35

Moreover, to the extent that the 2013 Supplemental Declaration conflicts with the Gondola Declaration, the 2013 Supplemental Declaration controls. The 2013 Supplemental Declaration *supplemented* the Gondola Declaration and updated it. Additionally, all parties to the 2013 Supplemental Declaration ratified the Gondola Easement and consented to its express language that it related back to and supplemented the Gondola Declaration. (2013 Suppl. Decl. ¶¶ 4–6.)

Second, Plaintiffs argue that the Gondola Easement and the 2013 Supplemental Declaration prove void, because they conflict with the POA Declaration and Illustrative Master Plan incorporated into the LOM. In support, Plaintiffs cite Section 3.4(b)(iii) of the POA Declaration, which states "[t]he Declaration, the Association or any Owner, as appropriate, when exercising the rights and easements granted by *this Article*, shall: . . . (iii) not unreasonably interfere with the affected Owner's use, enjoyment and benefit from such Owner's Parcels or the Association Area." (Pls.' Resp. at 26 (emphasis supplied).) Plaintiffs also cite Section 14.3 of the POA Declaration which provides that, "No amendment [to the POA Declaration] shall increase the financial obligations of an Owner in a discriminatory manner or further restrict development on existing Parcels in a discriminatory manner." (Pls.' Resp. at 27.) Finally, Plaintiffs cite the LOM, issued in connection with the 2006 Series Bonds, which includes an Illustrative Master Plan for the development of the Project. The Illustrative Master Plan states that "[a]s part of the Entertainment District, [Original Declarant] is proposing to construct an aerial gondola cable car system that will transport visitors across the Rappahannock River to historical attractions and a golf course in Stafford County, Virginia." (Compl. ¶ 77 (alteration in original).)

36

This argument fails as well, because the POA Declaration and the LOM do not relate to the Gondola Easement and the 2013 Supplemental Declaration that created it. Again, Virginia looks to the document that created the easement to determine the easement's scope and purpose. *Anderson*, 683 S.E.2d at 309–10. Although initially confusing the POA Declaration and Gondola Declaration in their Complaint, Plaintiffs concede that the Gondola Declaration stands as the instrument relevant to the Gondola Easement. (Pls.' Resp. at 9 and Ex. 1.) The Gondola Declaration established the right of the Gondola Declarant to impose a Gondola Easement — the POA Declaration did not. The 2013 Supplemental Declaration that actually created the Gondola Easement supplemented the Gondola Declaration — not the POA Declaration. Moreover, the POA provisions cited by Plaintiffs expressly limit their application to the rights and duties under the POA Declaration. Section 3.4 "Limitation on Exercise of Rights and Easements" specifically applies to the Gondola Declarant "when exercising the rights and easements granted by *this Article*" — i.e., Article 3, Easements, of the POA Declaration. Further, Section 14.3 "Prerequisites to Amendment" specifically applies to "any proposed amendment to *this Declaration*" — i.e., the POA Declaration. Accordingly, as a matter of law, the limitations under the POA Declaration have no bearing on the Gondola Easement by the terms of the instrument itself.

Finally, Plaintiffs also mistakenly rely on the LOM. Although the LOM described a once-intended purpose for the Gondola Facility, the 2013 Supplemental Declaration created the Gondola Easement and thereby established its purpose. Additionally, the LOM itself expressly states that the information in it, which includes the "Illustrative Master Plan," (1) " must not be relied upon," (2) can change without notice and (3) stands only true as of the date of the LOM, June 9, 2006. (LOM at 1, 4.) Accordingly, the Court finds that any alleged inconsistencies with

37

the Gondola Declaration, POA Declaration or LOM have no bearing on the Gondola Easement and the 2013 Supplemental Declaration.

Because the Gondola Easement and the 2013 Supplemental Declaration that created it have a valid and proper purpose, lack ambiguity or vagueness and do not violate the terms of any other governing documents, the Court hereby GRANTS Defendants' Motion to Dismiss with regard to Count Three of Plaintiffs' Complaint.

### 2.    Count Four: Termination of the Gondola Easement by Abandonment

Virginia law recognizes two ways to terminate an easement via abandonment: (1) pure abandonment by the holder of the easement and (2) prescriptive termination by the party burdened by the easement. *Helms v. Manspile*, 671 S.E.2d 127, 131 (Va. 2009). "Nonuse of an easement coupled with acts which evidence an intent to abandon or which evidence adverse use by the owner of the servient estate, acquiesced in by the owner of the dominant estate, constitutes abandonment." *Id.* (quoting *Robertson v. Robertson,* 197 S.E.2d 188 (Va. 1973)). Both methods require that the holder of the easement has not made use of it. *Id.* However, non-use alone never suffices to establish abandonment. *Id.*; *Lindsey v. Clark*, 69 S.E.2d 342, 344 (Va. 1952).

Here, Plaintiffs have sufficiently alleged non-use of the easement and Defendants do not dispute that allegation. (Compl. ¶¶ 100, 134; Defs.' Mem. at 26.) Additionally, Plaintiffs do not allege termination via prescription. Accordingly, the Court need only address whether the Complaint sufficiently pled acts by the Gondola Declarant evidencing an intent to abandon.

#### a)    *The Complaint fails to sufficiently allege intent to abandon*

In Virginia, a party can demonstrate an intent to abandon an easement by showing acts inconsistent with the enforcement of the easement. *Helms*, 671 S.E.2d at 131. However, a finding of an intent to abandon proves unwarranted when the evidence shows acts by the holder

that continue to recognize the easement despite non-use. *Barter Found., Inc. v. Widener*, 592 S.E.2d 56, 63 (Va. 2004) (holding that certain actions demonstrate "continuing recognition of the existence" of the easement despite non-use, rather than intent to abandon, such as the easement holder requiring an individual to obtain permission before clearing the easement for the individual's use, and an easement holder recording documents expressly mentioning the easement).

Here, Plaintiffs allege that the Gondola Declarant waived its right to enforce the easement when it failed to object to Silver's application for development approval within the Gondola Easement Area and separately released part of the easement to permit certain other development within the area. (Compl. ¶¶ 101–02; 2019 Partial Easement Release.)

However, taking these allegations as true, they do not conflict with the enforcement of the easement. The language creating the easement and ratified in its partial release expressly permit these acts. The 2013 Supplemental Declaration establishing the Gondola Easement allows the Gondola Declarant "to reconfigure, relocate, modify and/or release any portion, or the entirety, of the Gondola Easement." (2013 Suppl. Decl. ¶ 3.) Thus, releasing a portion of the easement does not conflict with its enforcement. Additionally, the instrument releasing the portion of the easement for specified development reiterates the Gondola Declarant's rights to modify the easement. (2019 Partial Easement Release at 1–2.) Further, the 2019 Partial Easement Release states, "[a]ll terms, covenants and conditions of the [Gondola Declaration as supplemented by the 2013 Supplemental Declaration] not expressly modified herein are hereby confirmed and ratified and remain in full force and effect." (2019 Partial Easement Release at 2.) Thus, the Gondola Easement remained in full force and effect according to the terms of the 2019 Partial Easement Release. It follows that the actual development of the property released

39

from the Gondola Easement Area also does not conflict with the enforcement of the Gondola Easement. (Compl. ¶ 102.) Although Defendants have not made use of the Gondola Easement, they did not act inconsistently with its enforcement by exercising the terms of the easement that allowed Defendants to modify its scope. [8]

Not only have Plaintiffs failed to plead acts inconsistent with the enforcement of the easement, they have alleged acts of the Gondola Declarant that show continued recognition of the easement. The formal act of releasing a portion of the Gondola Easement executed and recorded in the 2019 Partial Easement Release unequivocally shows a "continuing recognition of the existence" of the Gondola Easement. *Barter Found., Inc.,* 592 S.E.2d at 63. Additionally, Defendants' December 15 Letter informing the City of Fredericksburg that Plaintiffs' proposed development would conflict with the Gondola Easement also evidences a "continuing recognition" of the Gondola Easement. (Compl. ¶ 107.) Accordingly, Plaintiffs' allegations of abandonment fail as a matter of law, because they have failed to plead acts evincing an intent to abandon.

### b)      *Amendment would prove futile*

In response to Defendants' Motion to Dismiss, Plaintiffs request leave to amend their Complaint with an additional allegation of intent to abandon. Plaintiffs allege that Defendants entered into a lease with the City of Fredericksburg that gave Defendants the right "to construct

---

[8]      Additionally, the plain language of the Gondola Easement summarily refutes construction of Plaintiffs' allegations as claiming waiver of the right to enforce the easement:

> A failure by Declarant to enforce any provision herein contained in its favor or cure any violation by any owner, lessee, occupant, person or entity shall not be deemed a waiver of the right to enforce such obligation or cure such violation in the future or to enforce a similar or other obligation.

(Gondola Decl. ¶ 14.)

and operate a private cable gondola system to transport passengers across the Rappahannock River." (Pls.' Resp. at 28.)  The lease contained an automatic termination provision, Plaintiffs allege, that took effect "if the cable gondola system described herein is not constructed and operating on the Premises on or before July 10, 2012." (Pls.' Resp. at 28.)  Plaintiffs conclude that, because Defendants did not construct a Gondola system by that date, termination of the lease evidences an intent to abandon. (Pls.' Resp. at 28.)

When deciding whether to grant a motion to amend a complaint, courts may deny the motion when the amendment would prove futile. *See Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010); *Steinburg v. Chesterfield Cty. Plan. Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (stating that  "leave to amend a complaint . . . should be freely given . . . unless 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'") (citations omitted).

Here, as a matter of law, allowing the lease to lapse in 2012 does not and cannot evidence an intent to abandon the Gondola Easement, because it did not exist until 2013.  Because amendment to include this allegation would prove futile, the Court hereby DENIES Plaintiffs' request for leave to amend.

Therefore, the Court hereby GRANTS Defendants' Motion to Dismiss Count Four of Plaintiffs' Complaint.  Plaintiffs have failed to state a claim of abandonment, because they have not alleged evidence of the Gondola Declarant's intent to abandon the Gondola Easement. Moreover, Plaintiffs have demonstrated the Gondola Declarant's continued recognition of the easement and the proposed amendment proves futile.

41

### 3.   Count Five:  Slander of Title

In Virginia, a plaintiff establishes a slander of title claim by alleging facts showing "(1) the uttering and publication of the slanderous words by the defendant, (2) the falsity of the words, (3) malice, (4) and special damages." *Allison v. Shapiro & Burson, LLP*, 2009 WL 4015410, at *7 (W.D. Va. Nov. 19, 2009) (citing *Lodal v. Verizon Virginia, Inc.*, 74 Va. Cir. 110 (Fairfax 2007); *Bison Bldg. Co., LLC v. Brown*, 70 Va. Cir. 348, 355 (Fairfax 2006); 50 Am. Jur. 2d § 550 (2006)), *report and recommendation adopted*, 2009 WL 4931388 (W.D. Va. Dec. 14, 2009).  "The action is not for the words spoken, but for the special damages for the loss sustained by reason of the speaking and publication of the slander." *Redman v. Fed. Nat'l Mortg. Ass'n*, 2015 WL 149833, at *5 (W.D. Va. Jan. 12, 2015) (citing *Brown,* 70 Va. Cir. at 355). Accordingly, "[i]t is not sufficient to simply allege a cloud on the title of the plaintiffs' property; a plaintiff must plead and prove that he has suffered a monetary loss as a result of the defendant's actions." *Allison*, 2009 WL 4015410, at *7.  Under the Federal Rules of Civil Procedure, a plaintiff must plead special damages with specificity.  *See* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.").

Here, Plaintiffs allege that the Gondola Declarant committed slander of title by "recording and maintaining of record the [2013 Supplemental Declaration that created the Gondola Easement]," and sending the December 15 Letter, which asserted that Plaintiffs' proposed development interfered with the Gondola Easement.  (Compl. ¶¶ 107, 137).  Plaintiffs contend that the Gondola Declarant made these statements falsely and in bad faith to spite Plaintiffs and obstruct their lawful efforts to market and sell their parcels within the Project. (Compl. ¶¶ 105–09.)

As pleaded, Plaintiffs stake their entire slander of title claim on the validity of the Gondola Easement. Because the Court has not found the Gondola Easement to be void in Count Three and not waived or abandoned in Count Four, neither the 2013 Supplemental Declaration nor the December 15 Letter assert false statements regarding Plaintiffs' title. Accordingly, Plaintiffs' slander of title claim fails for lack of falsity. It proves, therefore, unnecessary for the Court to address whether Plaintiffs' Complaint sufficiently alleges malice and special damages.[9]

Because Plaintiffs' Complaint does not establish falsity, Count Five fails to state a claim as a matter of law. Therefore, the Court hereby GRANTS Defendants' Motion to Dismiss with regard to Count Five.

## IV.    CONCLUSION

For the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss (ECF No. 12). Specifically, the Court DENIES Defendants' Motion as to Counts One and Two of the Complaint (ECF No. 1). However, the Court GRANTS Defendants' Motion as to Counts Three, Four and Five. Additionally, the Court DENIES Plaintiffs' requests for leave to amend the Complaint.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  October 27, 2021

---

[9]     Moreover, because the claim fails on falsity, amendment of Plaintiffs' Complaint to state special damages would prove futile. (*See* Pls.' Resp. at 28–29 (describing a contract for a condominium development on Plaintiffs parcels that stalled due to the Gondola Easement).) Consequently, the Court hereby DENIES Plaintiffs' request to amend the Complaint.